J.S15034/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: N.D.B., A MINOR,  :    IN THE SUPERIOR COURT OF
               :           PENNSYLVANIA
               :
               :
APPEAL OF: A.A.B.         :
               :
               :      No. 2011 MDA 2013

Appeal from the Order Entered October 14, 2013
In the Court of Common Pleas of Centre County
Civil Division No(s).: CP-14-DP-0000034-2012

BEFORE: BOWES, OLSON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:        **FILED DECEMBER 19, 2014**

This case returns to this panel after we remanded for: (1) the trial court to file a supplemental Pa.R.A.P. 1925(a) opinion addressing the guardian *ad litem's* opposition to the goal change; and (2) the guardian *ad litem* to file an appellate brief in response to the trial court's supplemental Rule 1925(a) opinion. The trial court and guardian *ad litem* have done so.

Appellant, A.A.B., ("Father") appeals from the order entered on October 14, 2013, in the Centre County Court of Common Pleas, changing the permanency goal of N.D.B. ("Child") (born in September of 2012) from reunification to adoption. Father contends the court erred in changing the placement goal because (1) he and K.S.P. ("Mother") continued to make

---

[*] Former Justice specially assigned to the Superior Court.

progress in alleviating the conditions which led to the placement, (2) there is a strong parent–child bond and (3) the guardian *ad litem* opposed the goal change. We affirm.

The trial court summarized the facts and procedural posture of this case as follows:

> Centre County Children and Youth Services ("CYS") has been involved with [Father] intermittently since June 10, 1997, when the agency received a referral due to concerns that [Father] had been physically violent with his then infant son (A.A.B. born December 22, 1996). A.A.B. was placed, through an agreement with his parents, with his paternal grandparents. On September 9, 1998, the court determined that A.A.B. was no longer dependent, and since that time, A.A.B. has continued in the care and custody of his paternal grandparents. [Father's] second son, J.M.B., was born on January 31, 1999, and is not in [Father's] custody. [Father] has not had significant periods of custody of J.M.B. for the majority of J.M.B.'s life.
>
> [Father] has a significant criminal history. [Father] has previously been charged with receiving stolen property, burglary, theft by unlawful taking, simple assault, harassment, marijuana—small amount personal use and use/possession of drug paraphernalia, recklessly endangering another person, fleeing or attempting to elude an officer, reckless driving, careless driving, and DUI: Controlled Substance. [Father] is currently incarcerated for violating his probation on the DUI charge by driving on a suspended license.
>
> [Father's] wife, K.S.P. ("Mother"), is the biological mother of [Child]. CYS has been involved with [Mother] since the birth of her first child on November 10, 2006, and has previously placed her five older children in foster care. On October 7, 2008, [Mother's] parental rights were involuntarily terminated to her oldest child, D.A., and he was adopted on November 20, 2008. Her parental rights were involuntarily terminated to her twins, D.H. and H.J., on April 1, 2009, and the twins were adopted on June 24,

2009. On February 25, 2010, her parental rights were involuntarily terminated to Z.N., and Z.N. was adopted on April 16, 2010. On April 3, 2012, her parental rights were involuntarily terminated to E.I., her fifth child, and he was subsequently adopted on July 3, 2012.

CYS became involved with the family once again upon learning that [Mother] was pregnant with N.D.B. due to concerns stemming from the agency's previous involvement with the family. The agency had concerns regarding [Father and Mother's] mental and emotional limitations; substandard home conditions including overcrowding, an overabundance of pets, atrocious and lingering stench of body odor and ammonia, and no running water; financial troubles; transportation problems, poor parenting skills; relationship problems; and lack of cooperation with available support services. [Father and Mother] cancelled initial home visits scheduled in May and June 2012. After [Father and Mother] failed to appear for appointments, the case was closed in June 2012. On August 27, 2012, [Mother] contacted CYS and requested that a caseworker meet with her and [Father] to develop a plan for their unborn son. [Father and Mother] failed to appear at the scheduled meeting on September 6, 2012. [Father and Mother] did not return the caseworker's calls until September 10, 2012. The home visit was scheduled for September 11, 2012, but was not completed because [Child] was born that day.

On September 11, 2012, the Court granted CYS's emergency petition for protective custody and ordered that [Child] be placed in foster care. The agency took custody of [Child] at the hospital. A hearing was held on September 13, 2012. At that time, reunification services were initiated with Family Intervention Crisis Services ("FICS"). [Father and Mother] have also received services from Centre County Base Service Unit, Centre County WIC, Catholic Social Services, and Clear Concepts. On September 19, 2012, after a dependency hearing, the Court declared [Child] a dependent child under the Pennsylvania Juvenile Act at 42 Pa.C.S. § 6302(1),[1]

---

[1] A dependent child is defined as

ordered that [Child] continue to remain in foster care, and ordered reunification. At review hearings on December 11, 2012, March 5, 2013, and April 2, 2013, the court continued reunification efforts due to [Father and Mother's] moderate compliance with [Child's] permanency plan. A goal change hearing scheduled for July 8, 2013 was continued to October 14, 2013. On October 14, 2013, after the hearing, the Court ordered [Child's] placement goal be changed from "Return Home" to "Adoption" due to [Father and Mother's] failure to progress toward alleviating the circumstances that necessitated the original placement.

Trial Ct. Op., 12/5/13, at 1-3.

At the hearing on April 2, 2013, Lindsay Schreffler, the CYS caseworker, testified. N.T., 4/2/13, at 3.[2] She indicated that a hearing was held on March 5, 2013 and continued until April 2, 2013. On April 2nd, CYS requested that services with FICS end due to Father's and Mother's lack of

---

A child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302(1).

[2] We note there are two transcripts in the certified record dated April 2, 2013. Instantly, we refer to the notes of testimony filed of record on December 13, 2013.

progress in meeting the goals set for them. *Id.* at 4-5. CYS also "requested a three-month review to change the goal from return home to adoption." *Id.* at 5. Ms. Schreffler testified as follows:

> [Counsel for CYS]: You wrote that placement was due to [Mother and Father's] mental and emotional limitations, substandard home conditions including overcrowding, and overabundance, atrocious, and lingering stench of body odor and ammonia and no running water, financial troubles, transportation problems, poor parenting skills, relationship problems, and lack of cooperation with available support services. I would like to know, since the time that you authored this review plan, which I believe was on September 11, 2012, we're now almost a year later, what has transpired that makes those circumstances better?
>
> A: Throughout our work regarding [Child] with [Father and Mother], there were no issues as far as far as overcrowding in their [ ] home, or the animals. . . . However, the other issues as far as the parenting skills, concerns about the relationship, and lack of cooperation or support services  have remained an issue.
>
> *      *      *
>
> Q: Tell me about [the] house . . . .
>
> A: . . . I have not been able to see the house during this review period. And neither [Mother] nor [Father] contacted me, after leaving a voicemail, to see their home prior to court. When I did go to see their home to look over the heating issue in March, the heating registers were not appropriate that they had in the home. But I am not aware they have made those changes.
>
> Q: What are the circumstances now? What are the circumstances for [Father]?
>
> *      *      *

A: There were concerns about past anger issues that resulted in criminal charges, use of drugs. Also, concerns with regard to [Father and Mother's] relationship throughout the reunification process, and a concern whether or not he would be able to care for [Child], given that he has not provided care for a long period of time for his other two children.

\* \* \*

Q: You indicated that he has a history as well with regard to other children in his care. What does that mean?

A: That is correct. He does not have custody of either of his two children, two sons, [A.A.B.] or [J.M.B.]. . . .

Q: And why is that?

A: I believe due to past custody issues and concerns about his ability to parent his children.

Q: There is a history of [Father] having shaken baby problems; is that correct?

A: That is correct. There was a report that he had been physically violent with [A.A.B.] back in, I believe, 1997 or '98.

\* \* \*

Q: What has changed with respect to [Father]? If you know.

A: I am not aware of any changes within the last three months, if he has attended any of the counseling that was requested of him as part of reunification. I haven't received any documentation of attendance or completion of any programs.

Q: How did he do with respect to the opportunity afforded to him for reunification services?

A: He was not compliant with the request of reunification services. He did not complete any of the goals that were

asked of him by that program. And he was not accountable for his behavior as far as drug use or parenting inabilities.

*Id.* at 8-9, 10-11, 12-13.

Father testified at the hearing.

[Counsel for Father]: When you were involved with [FICS], it sounds like you did not get along with the folks that you were assigned to?

A: No.

\* \* \*

Q: Did you ever register any official complaints with the FICS supervisors or CYS?

A: Numerous times.

Q: What would you tell them?

A: I don't know, I tell them a lot of different things over the past course of time.

Q: What specifically about? Did you register complaints with CYS and/or with supervisors at FICS about how you proceed (sic) or how you felt you were being treated by the people assigned to you?

A: No, it wasn't CYS, it was FICS. I would file reports against the head person I can find, whoever it was. I would try to find whoever I could find and file a report and complain to them. I did, I complained. I complained to by governor and everybody.

Q: What response, if any, did you get from the FICS supervisors about that, about your complaints?

A: I'm stuck with these people.

\* \* \*

Q: And despite all that, did you attempt to do your best to cooperate and comply with the goals they set for you.

A: Yes. I did everything they asked. I answered all their questions honestly. Even though I didn't want to answer the questions, I was told I had to answer the questions, I answered them anyway.

*Id.* at 37, 38, 39.

Sandra K. Richer testified at the hearing on October 14, 2013 that she works for FICS and provides services for CYS. N.T., 10/14/13, at 49.

[Counsel for CYS]: You began your services, I believe, in May of 2013?

A: Yes, that's correct.

Q: And your role is after reunification ended as a result of this Court's Order of April 20th of 2013 the responsibility of supervising visits fell to [CYS]?

You filled that role even though you're employed by FICS?

A: Correct.

*        *        *

Q: You had eight visits?

A: Actually, I've had ten visits now currently.

*        *        *

Q: Is [Child] old enough to walk at this point?

A: He walks around the furniture. He pulls himself up, and he walks around the furniture.

Q: What is the response of [Mother and Father] to that?

A: He doesn't really get to do that much. [Father] especially wants him to be on that blanket. . . .

Q: Do you see them encouraging [Child] to move around; do (sic) see anything other than just the holding of the child at these visits?

A: No.

*    *    *

[Counsel for Father]: Did [Father] or [Mother] ever indicate they wanted [Child] to stay on that blanket because of their concern about the condition of the floor?

A: Yes.

*Id.* at 49, 57, 59, 74-75.

"[A]fter the hearing, the Court ordered that [Child's] placement goal be changed from 'Return Home' to 'Adoption' due to [Mother's and Father's] failure to progress toward alleviating the circumstances that necessitated the original placement." Trial Ct. Op. at 3. This timely appeal followed. Father filed a simultaneous statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and the trial court filed a responsive opinion.

Father raises the following issue for our review:[3]

Did the lower court err in changing the placement goal from "Return Home" to "Adoption" where [Mother and Father] continued to make progress towards alleviating the

---

[3] We note that Father does not provide any legal authority in support of his argument. *See* Pa.R.A.P. 2119(b). The "failure to develop an argument with citation to, and analysis of, relevant authority waives that issue on review." *Harris v. Toys "R" Us-Penn,Inc.*, 880 A.2d 1270, 1279 (Pa. Super. 2005). However, because this defect does not impede our ability to conduct appellate review, we decline to find waiver.

conditions which led to the placement of [Child] even after formal reunification services had ended, a strong parental-child bond existed and [Child's] guardian *ad litem* strongly opposed the goal change as not being in [Child's] best interests?

Father's Brief at 7. We review dependency cases according to the following standard:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.
>
> *    *    *
>
> . . . [A]ppellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually . . . they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court. . . .

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

> As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012) (citations omitted).

This matter is controlled by the Juvenile Act, 42 Pa.C.S. § 6301 *et seq*.

When considering a petition for goal change for a dependent child, the trial

court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved. [42 Pa.C.S.A. § 6351(f)].

***In re A.K.***, 936 A.2d 528, 533 (Pa. Super. 2007) (some citations omitted).

Additionally, section 6351(f.1) requires the trial court to make a

determination regarding the child's placement goal. Section 6351(f.1)

states, in pertinent part:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> \* \* \*
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).[4]

---

[4] We note Father avers the court erred in failing to consider the parent-child bond. We need not address this issue because it is not one of the statutory

On the issue of a placement goal change, this Court has stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. ***See In re Sweeney***, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." ***In re E.F.V.***, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

***In re K.C.***, 903 A.2d 12, 14-15 (Pa. Super. 2006).

The guardian *ad litem* represents "the legal interests and the best interests of the child." 42 Pa.C.S. § 6311(a). The Juvenile Act details the duties of a guardian *ad litem* as follows:

> **(b) Powers and duties.**—The guardian *ad litem* shall be charged with representation of the legal interests and the best interests of the child at every stage of the proceedings and shall do all of the following:
>
> (1) Meet with the child as soon as possible following appointment pursuant to section 6337 (relating to right to counsel) and on a regular basis thereafter in a manner appropriate to the child's age and maturity.

---

factors the court considers in determining the child's placement goal. ***See*** 42 Pa.C.S. § 6351(f).

(2) On a timely basis, be given access to relevant court and county agency records, reports of examination of the parents or other custodian of the child pursuant to this chapter and medical, psychological and school records.

(3) Participate in all proceedings, including hearings before masters, and administrative hearings and reviews to the degree necessary to adequately represent the child.

(4) Conduct such further investigation necessary to ascertain the facts.

(5) Interview potential witnesses, including the child's parents, caretakers and foster parents, examine and cross-examine witnesses and present witnesses and evidence necessary to protect the best interests of the child.

(6) At the earliest possible date, be advised by the county agency having legal custody of the child of:

(i) any plan to relocate the child or modify custody or visitation arrangements, including the reasons therefor, prior to the relocation or change in custody or visitation; and

(ii) any proceeding, investigation or hearing under 23 Pa.C.S. Ch. 63 (relating to child protective services) or this chapter directly affecting the child.

(7) **Make specific recommendations to the court relating to the appropriateness and safety of the child's placement and services necessary to address the child's needs and safety.**

(8) Explain the proceedings to the child to the extent appropriate given the child's age, mental condition and emotional condition.

(9) Advise the court of the child's wishes to the extent that they can be ascertained and present to the court whatever evidence exists to support the

> child's wishes. When appropriate because of the age or mental and emotional condition of the child, determine to the fullest extent possible the wishes of the child and communicate this information to the court. A difference between the child's wishes under this paragraph and the recommendations under paragraph (7) shall not be considered a conflict of interest for the guardian *ad litem*.

42 Pa.C.S. § 6311(b)(1)-(9) (emphasis added). A guardian *ad litem's* opinion is advisory. *In re Adoption of R.J.S.*, 889 A.2d 92, 100 n.8 (Pa. Super. 2005).

In the instant case, Father's brief does not point to any specific error by the trial court. Specifically, Father's brief raises the following assertions: "the past history of the parents was given undue weight by the agencies and the lower Court throughout this case;" "CYS was no longer interested in helping [Mother and Father] hone their parenting skills;" Mother and Father's "behavior between themselves and between themselves and [Child] at the supervised visits clearly shows that they are capable of parenting [Child] properly;" the guardian *ad litem* stated her "strong objection to the proposed goal change." Father's Brief at 13, 14, 15, 21.

The trial court determined that changing the placement goal from return home to adoption was in Child's best interests. The court opined:

> Despite the efforts of multiple service providers, [Father and Mother] have not made necessary progress to assure the Court that it would be safe to return [Child] to their care and custody. [Father and Mother] have failed to meet the three goals that were set out for them in October 2012 to show that they were capable of ensuring [Child's] safety and meeting his ever-changing developmental needs. The

three goals were: (1) [Father and Mother] demonstrate the ability to take care of [Child]; (2) [Father and Mother] take care of themselves, including cooperating with services as recommended; (3) to secure and maintain stable housing and manage money carefully. Over the course of reunification, [Father] has failed to progress on these goals in large part due to his lack of cooperation with FICS. [Father] has demonstrated an unwillingness to learn to become a better parent by telling [CYS] workers that they were unable to teach him anything, by being argumentative, and by being unresponsive to basic questions.

First, [Father and Mother] have failed to show FICS that they are able to take care of [Child's] basic needs. At visits when [Child] was an infant, they had difficulty mixing his formula properly while preparing his bottles. [Father and Mother] could not recognize [Child's] basic cues, such as when he was hungry or needed a diaper change. When [Child] graduated to eating whole foods, [Father and Mother] continued to feed him baby food for his snack. They also regularly brought him an insufficient amount of snacks. Neither parent was able to show that they could care for [Child] on their own . . . .

Second [Father and Mother] have shown an inability to take care of themselves, including an inability on [Father's] part to cooperate with services. Although he continues to receive drug and alcohol counseling as well as anger management counseling, he has failed to show commitment and stability by routinely switching providers. [Father] had been working with Clear Concepts for drug and alcohol counseling, but quit. He had been working with Catholic Social Services for anger management issues, but quit. Similarly, [Mother] had been working with the Women's Resource Center, but quit. She has not followed through on her commitment to attend counseling to deal with previous domestic violence that she has experienced. This inability to commit to counseling was especially an issue because [Father and Mother] needed to demonstrate progress in a short period of time. [Father and Mother] have also shown an inability to take care of themselves by failing to refrain from criminality. At the time of the goal change hearing in October 2013, [Father]

was incarcerated for driving on a suspended license. According to the Child Permanency Plan filed on November 21, 2013, [Mother] was incarcerated in November 2013 as well.

Third, [Father and Mother] have failed to show FICS that they are capable of maintaining a safe home that is appropriate for a young child or to manage their money carefully. [Father and Mother] have been unable to maintain stable housing because they spend half of the week at their home in Pine Glenn, Pennsylvania and half of the week at [Father's] parents' house in Bellefonte, Pennsylvania. Although caseworkers repeatedly told [Father and Mother] that they needed to live in their home as though [Child] were there, they would not turn on the heat even when the outside temperatures necessitated doing so. They installed inappropriate and dangerous heat registers and left construction tools and materials unsecured throughout the house. . . .

In short, [Father and Mother's] minimal efforts to comply with the three goals set out for them over a year ago are not enough to overcome the agency's legitimate concern for the safety and well-being of [Child] if he were to return to their care.

Trial Ct. Op. at 3-5.

As stated above, this panel previously remanded for: (1) the trial court to file a supplemental Pa.R.A.P. 1925(a) opinion addressing the guardian *ad litem's* opposition to the goal change; and (2) the guardian *ad litem* to file an appellate brief in response to the trial court's supplemental Rule 1925(a) opinion.

In this case, the guardian *ad litem* stated [at the October 14th hearing] that she opposed the goal change because in the months she had known [Mother and Father], they had demonstrated "increased maturity and responsibility," she believed that reuinification had not been successful due to "personality conflicts," and she did

- 16 -

not "see any way in which [Mother and Father] are currently unfit." N.T. [ ] at 135. She did not present testimony or evidence to support her opinion. The Court disagreed with her assessment of [Mother and Father's] abilities. As explained in this [c]ourt's initial 1925(a), the testimony showed that [Mother and Father] had not improved their maturity or taken responsibility for bettering their parenting skills or finances. N.T. [ ] at 135-140.[5] Although the [c]ourt recognized that [Mother and Father] had made some changes, the changes were not significant enough to overcome the [c]ourt's concern that the best interests of [Child] were not being met through reunification. Further, the [c]ourt did not believe that "personality conflicts" had affected reunification, but rather [Mother and Father's] inability to modify their behavior to meet the goals set for them had made reunification services unsuccessful. Thus, the [c]ourt ultimately concluded that the recommendation set forth by the guardian *ad litem* was not supported by the competent testimony and evidence.

Trial Ct. Op., 9/25/14, at 2.

In the brief following remand, the guardian *ad litem* stated:

The undersigned counsel is not blind to the shortcomings of [Father], and did not recommend an immediate return of [Child] to [Mother and Father]. . . .

The real issues for [Father] are centered on a possible history of domestic violence and a known criminal history. Unfortunately, the veracity of the domestic violence claim has not been tested and minimal information is available. The criminal record is undisputed, and it is agreed that a parent needs to stay out of jail to provide familial security and stability. The reasons for [Child's] placement were based in large part on his mother's history with [CYS]. Most of the initial problems have been resolved, and **it remains uncertain whether additional reunification services can provide a full remedy**. . . . **The**

---

[5] Counsel for CYS indicated that at the time of the hearing the only major change was the fact that Father was in prison. N.T. at 139.

> **undersigned counsel notes that a very significant amount of time has passed, complicating matters, but [Child] would remain in his supportive foster home during potential future reunification. At the end of services, his best interests would be reevaluated.**

Guardian *Ad Litem's* Brief at 2-3 (emphasis added).

The trial court considered, *inter alia*, the continuing necessity for placement, compliance with the service plan, and the extent of Father's progress in alleviating the circumstances which necessitated placement. *See* 42 Pa.C.S. § 6351(f); *In re A.K.*, 936 A.2d at 533. The court concluded that changing the placement goal from return home to adoption was in Child's best interests. *See* 42 Pa.C.S. § 6351(f.1); *In re K.C.*, 903 A.2d at 14-15. We discern no abuse of discretion. *See In re R.J.T.*, 9 A.3d at 1190. Accordingly, we affirm the trial court's order, changing Child's permanency goal to adoption.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/2014