**In re: ADOPTION OF R.J.S.,**

**Appeal of: B.A.H. & B.D.H., Adoptive Parents, Appellants.**

Superior Court of Pennsylvania.

Argued Aug. 30, 2005.
Filed Nov. 14, 2005.

Joseph J. Yeager, Forty Fort, for appellants.

David S. Rasner, Philadelphia, for D.S. & M.S., appellees.

BEFORE: HUDOCK, BOWES and BECK, JJ.

OPINION BY BOWES, J.:

¶ 1 B.A.H. and B.D.H. ("Aunt" and "Uncle," respectively, or "Appellants") appeal the order entered on November 17, 2004, denying and dismissing their petition for adoption. We affirm.

¶ 2 Appellants are the maternal aunt and uncle of R.J.S., born October 5, 1995. Appellant Aunt is a sister to R.J.S.'s mother, R.S. ("Mother"). Tragically, R.J.S.'s biological father, D.S., committed suicide on April 17, 1997. Appellees ("Grandparents"), who live in Lackawanna County, are D.S.'s parents and R.J.S.'s paternal grandparents. R.J.S. lived with Grandparents[1] from his birth until December 31, 1997, when Mother took the child and relocated to Luzerne County. Thereafter, without informing Grandparents, Mother decided that R.J.S. should live with Aunt and Uncle in Luzerne County.

¶ 3 On February 2, 1998, Aunt and Uncle filed a custody complaint in Luzerne County, in which Mother joined, to transfer physical custody of R.J.S. from Mother to Aunt and Uncle. On February 4, 1998, the custody stipulation between Mother and Aunt and Uncle was made an order of court.

¶ 4 Unaware of this prior Luzerne County custody stipulation, Grandparents filed a custody action on February 13, 1998, in Lackawanna County, seeking to confirm their primary physical custody of R.J.S. and alleging their *in loco parentis* status to the child. The parties at some point agreed that Luzerne County[2] "had juris-

---

1. The record does not reveal whether Mother or D.S. also lived with Grandparents during this time. The record is clear, however, that Grandparents functioned in a parental role to R.J.S. because, as the evaluative psychologist testified, "[T]here were two parents who were not able to do it. [Mother] and [D.S.] were so involved in their own mental health issues and drug and alcohol issues, they could not

effectively care for this child." N.T., 9/26/02, at 22.

2. Thereafter, all proceedings referenced herein occurred in Luzerne County. The record is not comprehensive regarding all orders entered by the common pleas court regarding the custody dispute between Grandparents and Aunt and Uncle. We have endeavored to

diction and all matters relating to the custody of [R.J.S.] were to be heard ... in Luzerne County ...." for a determination of custody. Petition to vacate order granting periods of partial custody, 8/31/00, at 1; Supplemental Reproduced Record for Appellees at 35b, Answer to petition to vacate, 11/28/00, at 1. The custody court ordered a comprehensive custody evaluation, the matter proceeded to a Master, and finally, a full custody hearing took place in Luzerne County on February 29, 2000,[3] following which the trial court granted Aunt and Uncle legal and primary physical custody of R.J.S. Grandparents received periods of partial custody on alternating weekends and certain stipulated holidays. The February 29, 2000 order also required the parties to keep one another informed regarding major issues affecting R.J.S. *See* Order, 2/29/2000, at 2. (The parties shall be kept informed of R.J.S.'s "medical, social, educational, religious or other relevant information ... including extracurricular activities and special events so as to enable [Grandparents] to attend ...."). A March 3, 2000 order altered the holiday schedule for Grandparents.

¶ 5 On June 5, 2000, Mother filed a petition for permission to relinquish her parental rights in favor of Aunt and Uncle in the Luzerne County Orphans' Court. The court held a hearing on June 21, 2000, wherein Mother testified that because she was a heroin addict, she believed that R.J.S.'s best interests would be served by voluntary relinquishment of her parental rights.[4] The court granted the petition that day. On August 4, 2000, without notice to Grandparents, Aunt and Uncle filed a petition for adoption of R.J.S. Although paragraph 4 of the adoption petition required identification of the time and places where the child had lived since his birth, Aunt and Uncle pointedly left the question blank. Adoption petition, 8/4/00, at ¶ 4. By this glaring omission, Aunt and Uncle failed to reveal that R.J.S. lived with Grandparents from birth to age two.

¶ 6 On August 23, 2000, the court held a hearing on the petition for adoption. When asked on direct examination to list everyone R.J.S. had lived with since birth, Appellant Aunt testified that R.J.S. had lived with Mother and then with Aunt and Uncle, again failing to apprise the court that the child had resided with Grandparents for the first two years of his life. N.T., 8/23/00, at 4. At the conclusion of the hearing, the court granted the adoption.

¶ 7 On August 31, 2000, Aunt and Uncle filed a petition to vacate the February 29, 2000, and March 3, 2000 orders granting partial physical custody of R.J.S. to Grandparents based upon Appellants' adoption of the child. Significantly, "[I]t was not until after [Aunt and Uncle] filed a Petition to Vacate ... that Grandparents learned of the adoption action." Grandparents' brief at 4. On September 1, 2000, Grandparents immediately filed a petition seeking to hold Aunt and Uncle in contempt, to set aside the adoption, and to transfer custody of R.J.S. to them. On November 14, 2000, the trial court directed Valley Counseling Associates to complete an updated evaluation of the parties and R.J.S. The court

piece together as accurate a time line as possible.

3. Neither the record certified to us on appeal in the instant case nor the companion custody case, which was consolidated below, includes the notes of testimony from the February 29, 2000 hearing. The office of the Prothonotary

advises that transcription of the notes of testimony from this hearing was not ordered.

4. Mother also testified that she had a four-month-old child at the time of the June 21, 2000 hearing. N.T., 6/21/00, at 4.

issued interim orders on November 16, 2000, and December 15, 2000, granting Grandparents partial custody every third weekend and on certain holidays. On June 26, 2001, concluding that Grandparents had been entitled to notice of the adoption proceedings, the court vacated the adoption decree subject to reinstatement and scheduled a hearing for September 24, 2001, in order to receive testimony on the issue of whether adoption by Aunt and Uncle was in the best interest of R.J.S.

■■ ¶ 8 It appears that hearing was not held at that time. On July 24, 2001, Aunt and Uncle filed a notice of appeal from the June 26, 2001 order vacating the August 23, 2000 adoption decree. On August 1, 2001, the court directed Aunt and Uncle to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), but they did not comply. Thereafter, on December 4, 2002, this Court dismissed Aunt and Uncle's appeal for failure to file a docketing statement. *See* Pa.R.A.P. 3517.[5]

¶ 9 Throughout the next two years, several evaluations and conferences concerning custody of R.J.S. were held. The custody and adoption actions were consolidated on August 27, 2002, in response to Grandparents' petition filed that day; the orphans' court also added Grandparents as additional parties "to the Adoption Petition for purposes of Intervention and/or Contesting same." Order, 8/27/02, at 2. Dr. Lenora Herrmann–Finn,[6] an evaluative psychologist, concluded that adoption by Aunt and Uncle was in the best interest of the child **only if** Grandparents remained an integral part of the child's life. The guardian *ad litem* recommended that additional custody be awarded to Grandparents. On November 17, 2004, the orphans' court denied and dismissed Aunt and Uncle's petition for adoption, but maintained physical and legal custody with Aunt and Uncle. It awarded Grandparents partial custody on alternating weekends and specified holidays. This appeal ensued.

¶ 10 On appeal, Aunt and Uncle raise the following issues:

1. Did the Lower Court err in vacating the adoption decree of August 23, 2000[?]

2. Did the Lower Court abuse its discretion in denying and dismissing the Petition for Adoption filed by Appellants?

Appellants' brief at 4.

■■ ¶ 11 Our standard of review when considering an appeal from an orphans' court order is as follows:

5. We note that the order appealed from was not a final order. The June 26, 2001 order vacating the adoption decree on the basis that Grandparents had been entitled to notice stated that the order was vacated "subject to reinstatement." Moreover, the court contemplated further proceedings and in fact, scheduled a hearing for the purpose of allowing Grandparents to present evidence relevant to whether adoption was in R.J.S.'s best interest. As such, the order did not dispose of all claims of all parties. Pa.R.A.P. 341(b). Generally, an order that anticipates further proceedings is interlocutory and unappealable. *West v. West*, 301 Pa.Super. 75, 446 A.2d 1342 (1982); *compare In the Interest of H.S.W.C.-B.*, 575 Pa. 473, 836 A.2d 908 (2003), where, in the context of dependency, the Court stated that an order maintaining the *status quo* or changing the goal for a child's disposition was appealable.

6. At the June 26, 2002 hearing, the orphans' court noted that Dr. Herrmann–Finn of Valley Counseling Associates "is the court's witness. Therefore, that being the situation, I'll let everyone take Doctor Finn as of cross-examination." N.T., 9/26/02, at 5. An August 17, 1998 order had directed that the parties "equally shall [bear] the responsibility for paying all fees assessed by Valley Counseling Associates ...." Order, 8/17/98, at 2.

This court must determine whether the record is free from legal error and the orphans' court's factual findings are supported by the evidence. Because the court sits as the fact-finder, it determines the credibility of the witnesses and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re Adoption of A.M.B.*, 812 A.2d 659, 662 (Pa.Super.2002). Our scope of review when the orphans' court has granted a petition to vacate an adoption "is limited to determining whether the trial court's findings are supported by competent evidence or whether the court abused its discretion or committed an error of law." *In re Adoption of S.A.J.*, 575 Pa. 624, 631, 838 A.2d 616, 620 (2003) (quoting *In the Matter of the Adoption of Christopher P.*, 480 Pa. 79, 86, 389 A.2d 94, 98 (1978)).

¶ 12 Aunt and Uncle contend the court erred in vacating the adoption decree and in concluding that Grandparents were entitled to notice of the adoption hearing. They assert that the Adoption Act did not require them to provide notice to Grandparents. Their sole support is *Faust v. Messinger*, 345 Pa.Super. 155, 497 A.2d 1351 (1985), where the court held that a minor child's grandparent, seeking to vacate an adoption decree one and one-half years after its implementation, was not required to receive notice of a pending adoption.

¶ 13 *Faust* is readily distinguishable from the instant case on two bases. First, the *Faust* grandparent's sole claim to entitlement of notice related to the Custody and Grandparents Visitation Act. In contrast, Grandparents herein based their entitlement to seek custody on their *in loco parentis* status in addition to their statutory rights. *Walkenstein v. Walkenstein*, 443 Pa.Super. 683, 663 A.2d 178 (1995) (where party stands *in loco parentis* to

child standing to pursue custody action against biological parent is granted). Second, the grandparent in *Faust* failed to institute an action for visitation of her grandson before his adoption despite the Act's provision entitling her to do so. In the instant case, Grandparents enjoyed court-ordered partial custody every other weekend at the time Aunt and Uncle filed their adoption petition.

¶ 14 More significantly, the Adoption Act, 23 Pa.C.S. § 2101 *et seq.*, sets forth the requirements of notice for the time and place of the adoption hearing. While Aunt and Uncle focus on the fact that Grandparents are not delineated as parties requiring notice for the hearing, they conveniently ignore that the statute requires notice of the adoption hearing not only to every person whose consent is required, but also "to such other persons as the court shall direct." 23 Pa.C.S. § 2721.

¶ 15 *In re Adoption of B.E.W.G.*, 379 Pa.Super. 264, 549 A.2d 1286 (1988), provides guidance. The facts of that case are as follows. The children's father, who had murdered the children's mother, was placed in jail; the children initially resided with the paternal grandfather. The maternal grandparents then sought custody of the children and temporarily were granted visitation. However, the father was released on bail and was granted physical custody of the children until the criminal charges against him were resolved. The father then took the children from their home in New York and concealed their whereabouts. He was convicted of manslaughter on May 22, 1984, and sentenced to a term of imprisonment. On May 29, 1984, the New York Family Court entered an order awarding the grandparents temporary custody of the children. At a subsequent custody hearing on June 11, 1984, the father refused to reveal the children's location. The New York Court

entered a final order on November 9, 1984, granting custody to the grandparents even though the children's whereabouts remained unknown.

¶ 16 Unbeknownst to the grandparents, the father had taken the children to an adoption agency, had executed a temporary custody agreement, and placed them in an adoptive home. The adopting parents, who lived in York County, had filed a report of intention to adopt without notice to the grandparents on May 16, 1984, in York County. Counsel informed the York County Orphans' Court that the grandparents had visitation and likely would seek custody if the father was convicted and sentenced to prison. The court continued the case and asked counsel for assurance that the New York courts "do not already have legal jurisdiction over these two children." *Id.* at 1287. The York County Orphans' Court ultimately entered a decree allowing the adoption on June 25, 1984; the record did not reveal whether the York County Court gave further consideration to the grandparents' custody proceedings in New York.

¶ 17 In August 1985, the grandparents learned for the first time that the children were living with adoptive parents somewhere in Pennsylvania. On January 14, 1986, the grandparents sought to vacate the adoption decree. The orphans' court ultimately rejected the grandparents' claim that they should have been given notice of the adoption proceedings and dismissed the petition to vacate the adoption decree. The grandparents appealed to this Court, and we reversed, concluding that they were entitled to notice of the adoption proceedings and an opportunity to be heard.

¶ 18 Clearly, the reasoning of *B.E.W.G.*, which involved an ongoing custody action in a sister state, is applicable herein where the ongoing custody action occurred in a sister county.

[I]t does not follow that Pennsylvania courts can ignore with impunity a custody action or decree in the courts of a sister state. The Pennsylvania Adoption Law, which provides for notice "to such other persons as the court shall direct," **requires at the very least that notice of the adoption proceedings be given to the parties to a pending custody action or, as here, to grandparents who have been granted custody of the children** by the court of another state .... The courts of this Commonwealth will not be permitted to become accessories to the conniving act of a parent who attempts to evade a custody order .... Here, the father unilaterally had removed the children from the State of New York, in defiance of custody proceedings there pending, and had surrendered them for adoption in Pennsylvania. The court in Pennsylvania, having had knowledge of the custody proceedings in New York, could not enter an adoption decree calculated to defeat the New York custody decree without communicating with the New York court and giving notice to the persons who had been awarded custody in the New York action. When it nevertheless attempted to do so, the court abused its discretion.

*Id.* at 1290–91 (emphasis added). In the instant case, if the orphans' court had been apprised of Grandparents' partial custody rights and the ongoing nature of that custody action, it would have directed that Grandparents be given notice of the adoption action by Appellants, as evidenced by the court's ultimate conclusion that Grandparents were entitle to notice in its June 26, 2001 order vacating the adoption decree subject to reinstatement.

¶ 19 Additionally, the record supports a conclusion that Aunt and Uncle deceived

the court below. Indeed, in its June 26, 2001 order vacating the adoption decree subject to reinstatement, the orphans' court implied as much and stated that Grandparents had been entitled to notice of the adoption because, *inter alia,* "[Aunt and Uncle's] counsel was aware" of the order granting Grandparents partial custody and their relationship to R.J.S. Order, 6/26/01, at 1.

¶ 20 Moreover, Grandparents assert that they "successfully demonstrated that [Aunt and Uncle] obtained the adoption of the Child through secret and dishonest means by not telling the court about the pending custody action with Grandparents and by making certain that neither Grandparents nor their counsel knew about the adoption action." Appellees' brief at 10. Grandparents also contend that "although [Aunt and Uncle] and Grandparents were **actively** involved in custody litigation regarding [R.J.S.], [Aunt and Uncle] and their counsel kept the adoption proceedings secret from Grandparents and their counsel." *Id.* at 11 (emphasis in original). Such allegations assuredly encompass the perpetration of a deception on the court. Clearly, we may uphold a decision below if there is any proper basis for the result reached; thus, our affirmance may be based on different grounds from the trial court. *Frank v. Frank,* 833 A.2d 194 (Pa.Super.2003); *Weber v. Lynch,* 237 Pa.Super. 48, 346 A.2d 363 (1975).

¶ 21 *B.E.W.G.* again provides guidance. Therein, fraud was not established because the circumstances surrounding the children's presence in Pennsylvania and the pendency of the New York custody action were revealed to the Pennsylvania orphans' court prior to the adoption. In the instant case, however, Aunt and Uncle concealed the on-going custody action from the orphans' court. Further, Aunt and

Uncle failed to complete the portion of the adoption petition requiring potential adoptive parents to reveal the parties with whom the child had lived since birth. This was crucial information for the orphans' court's consideration. Our Supreme Court noted, "The essence of fraud is deceit intentionally and successfully practiced to induce another to part with property or with some legal right. Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact or **by silence when good faith required expression.**" *Thorne's Estate,* 344 Pa. 503, 511, 25 A.2d 811, 816 (1942) (emphasis added); *In Re McClellan's Estate,* 365 Pa. 401, 75 A.2d 595 (1950). This Court stated that "fraud comprises 'anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether by direct falsehood or innuendo, by speech **or silence**, word of mouth, or look or gesture ....'" *Estate of Doerr,* 388 Pa.Super. 474, 565 A.2d 1207, 1211 (1989) (emphasis added); *see also Hart v. Arnold,* 2005 PA Super 328, ¶ 43 n. 7, 884 A.2d 316.

¶ 22 Aunt and Uncle's failure to be forthright and candid, indeed, their omission and silence when good faith required expression, speaks volumes regarding their desirability as adoptive parents of this child who has enjoyed a loving relationship with his paternal grandparents. *Keeler's Adoption,* 52 Pa.Super. 516 (1913) (prospective adoptive parent's failure to reveal natural mother's desire in order to obtain adoption constituted "a legal fraud on the court to suppress the jurisdictional facts and for that reason the decree was invalid, and the ... court had ample authority to vacate the decree it had erroneously entered."). As we observed nearly a century ago:

[T]he [adoption] petition ... was presented and the decree secured, without the court being informed of the actual and vital facts of the case .... It may be well that the court was not designedly imposed on by the petitioner, and he took a chance on the subsequent ratification by the mother. However, the petitioner suppressed a fact, which if known by the court, would have prevented the decree, and he is not now in position to complain of a decree which would have been entered had the whole truth been exhibited at the time it was entered. No court of justice will set aside or even be led to look into a solemn judgment on light or trival [sic] ground; but when it is alleged upon adequate proofs that a judgment in whole or in part has been obtained by a suppression of truth, which it was the duty of the party to disclose; or by the suggestion of a falsehood or by any of the infinite and therefore indefinable means by which fraud may be practiced, no court will allow itself, its records, and the process of law to be used as instruments of fraud: *Cochran v. Eldridge*, 49 Pa. 365. While there is no suggestion of designed or actual fraud, as such, in this case, it was clearly a legal fraud on the court to suppress the jurisdictional facts and for that reason the decree was invalid, and the same court had ample authority to vacate the decree it had erroneously entered: *Fisher v. Ry. Co.*, 185 Pa. 602, 40 A. 97.

*Keeler's Adoption, supra* at 4.

■ ¶ 23 Finally, even if we were to be convinced that the orphans' court was not deceived, the record supports the conclusion that revocation of the adoption decree was in R.J.S.'s best interests. In the absence of fraud, an adoption will be revoked if it is in the best interest of the child to do so, as the welfare of the child is of paramount importance, even in proceedings to vacate an adoption decree. *In re Adoption of List*, 418 Pa. 503, 211 A.2d 870 (1965). *Wilder*, Pa. Family Law Prac. and Proc. (5th ed.), § 32–14. This Court stated in *In re Adoption of J.E.F.*, 864 A.2d 1207, 1211 (Pa.Super.2004) (citing *In re Adoption of Hess*, 530 Pa. 218, 227, 608 A.2d 10, 14 (1992)), that "a child's interests are best served when all those who demonstrate an interest in [the child's] welfare are allowed to be heard." Grandparents have shown a strong interest in the welfare of R.J.S. since his birth. In addition to taking him into their home for two years, Grandparents consistently have fought for and were granted custody rights. Moreover, pursuant to 23 Pa.C.S. § 2902(a), statements made in an adoption petition must be true, and it must be shown that "the needs and welfare of the person proposed to be adopted will be promoted by the adoption."

■ ¶ 24 As noted *supra*, it is well-settled that adoption must be in the best interest of the child. *See, e.g., In re Adoption of Hess, supra; In re Adoption of List, supra* (welfare of child is of paramount importance in proceedings to vacate adoption decree); *Adoption of Baby Boy McKnight*, 338 Pa.Super. 603, 488 A.2d 56 (1983); 23 Pa.C.S. § 2902(a). It is difficult to identify the precise nature of Appellants' argument regarding R.J.S.'s best interests, which is encompassed in their contention that the orphans' court abused its discretion in dismissing the adoption petition. At most, Aunt and Uncle elucidate some facts but fall short of establishing the significance of those facts. For example, Aunt and Uncle suggest that the parties "were living with and working with-in (sic) the confines of an ongoing custody order." Appellants' brief at 12. Read in an expansive light, Aunt and Uncle might be inferring that they would allow Grandparents'

involvement with R.J.S. even if the adoption were permitted. However, Aunt and Uncle sought to vacate Grandparents' periods of partial custody, and their representation that such maneuverings were prompted solely by Grandparents' petition to set aside the adoption is self-serving and rings hollow. It is more likely that Aunt and Uncle tolerated Grandparents' involvement only because it was ordered by the court, as they sought to terminate it at the first available opportunity. This behavior provides additional fuel to the conclusion that if permitted to adopt R.J.S., upon the concomitant termination of any legal rights in Grandparents,[7] Aunt and Uncle would be unsupportive of R.J.S.'s continued contact with Grandparents. Such a conclusion also is supported by the recommendation of the Guardian *ad Litem* ("GAL") herein, who stated:

At best, it is uncertain whether [Aunt and Uncle] would maintain or encourage R.J.S.'s relationship with [Grandparents], at worst, they would seek to limit the relationship. Either way, it is necessary to ensure that [Grandparents] maintain a legally reciprocal and enforceable right to contact with the child, in order to preserve the beneficial relationship to the child. Therefore, with great reluctance, the Guardian ad Litem

must recommend that the adoption not be granted as not being in the best interest of the minor child.

Recommendation of the Guardian *ad Litem*, 10/29/04, at 2.[8]

¶ 25 The expert testimony offered at the September 26, 2002 hearing following the orphans' court's vacation of the original adoption decree confirmed the importance of Grandparents' involvement in R.J.S.'s life. Dr. Herrmann–Finn completed three separate custody evaluations in this case: one in 1999, one in 2001, and the final one in September 2002. N.T., 9/26/02.[9] As part of those evaluations, Dr. Herrmann–Finn completed assessments of cognitive functioning and R.J.S.'s bonding with the parties. Dr. Herrmann–Finn concluded that Grandparents functioned as parental figures in R.J.S.'s life when he was young. *Id.* at 20. She recommended that adoption by Aunt and Uncle was in the child's best interest only if Grandparents remained a significant part of his life:

[Dr. Herrmann–Finn]: [T]hese grandparents have been an integral part of this child's life for a very long time and they need to continue that. [R.J.S.] has benefited from his time with [Grandparents] and [Aunt and Uncle] at this point

---

7. A decree of adoption terminates forever all relations between a child and his biological parents and severs the child entirely from its own family tree and engrafts it upon its new parentage. *In re Baby Boy Benjamin*, 452 Pa. 149, 305 A.2d 360 (1973). Moreover, "When the child is adopted by someone other than a stepparent or grandparent [as here], the decree of adoption also terminates the natural grandparent's visitation rights under the Custody and Grandparents' Visitation Act." Wilder, *supra*, at § 32–8; 23 Pa.C.S. § 5314; *Faust v. Messinger, supra.* Section 5314 provides in pertinent part, "Any visitation rights granted pursuant to this section prior to the adoption of the child shall be automatically terminated upon such adoption."

8. The GAL is appointed by the court to represent the minor child's interest; such appointment generally is reserved for actions where the child's interest may be affected adversely, such as in adoptions. 23 Pa.C.S. § 2313(a). A GAL's recommendation is advisory, and the court herein treated it as such. *C.W. v. K.A.W.*, 774 A.2d 745 (Pa.Super.2001).

9. Appellants assert that this testimony was received pursuant to the lower court's order of June 26, 2001. As the caption on the transcript from the June 26, 2001 notes of testimony failed to include the orphans' court term and number, it initially was not made part of the record, but it subsequently has been provided as a supplemental record.

support [Grandparents] but they are not at the level yet where we could rely on the cooperation of the four of them to get this child to different places. I think that at this point in time until these four people can reconcile their own issues, [R.J.S.'s] time with [Grandparents] need[s] to be at the directive of the Court so that it happens on a regular basis.

. . . .

At this point in time [R.J.S.] perceives [Grandparents] as his grandparents, but yet there is history here. There is history where [R.J.S.] has been taken to these people as a respite.

. . . .

The reason I recommended the amount of time that I recommended was that this child has developed a very very strong nurturing positive bond with [Grandparents]. If we're going to look at the best interest of this child, we need to move away from the concept of win/loss . . . .

[By Grandparents' counsel]:

Q. So, that if I would to [sic] say to you that your position for adoption of this child by [Aunt and Uncle] is conditioned upon [Grandparents] having extensive partial custody rights, would I be correct?

[Dr. Herrmann–Finn]:

A. Yes. Both needs [sic] to happen.

[Grandparents' counsel]:

Q. Now if that could not happen, if they do not have partial custody of their grandson, if the adoption were granted, would you still be in favor of the adoption?

[Dr. Herrmann–Finn]:

A. . . . All I can speak to is the best interest of this child. This child needs stability. This child needs the stability of knowing who his parents are and that can occur through adoption. That needs to be supplemented by contact with the grandparents. The package needs to be implemented. **If one piece of it is missing, I would have grave concerns**.

[Grandparents' counsel]:

Q. If I suggest to you to assume that an adoption would terminate the rights of these people as grandparents so that there would be no schedule of an imposed Order regarding custody, I take it then your position would be that you do not favor the adoption because as you said, that [R.J.S.] needs all these parties in his life, am I correct?

[Dr. Herrmann–Finn]:

A. Well, what I would then say is that these people need to work together with the counselor to reach the point of agreement and that everyone would then support the adoption process so [Grandparents] would remain involved. **If that can't happen at this point, then it's not in the best interest of this child.**

*Id.* at 28–34 (emphasis added).

¶ 26 Dr. Herrmann–Finn was consistent and adamant. Aunt and Uncle's adoption of R.J.S. was in the child's best interest only if the court could concurrently grant Grandparents' partial custody. Since adoption would relinquish all of Grandparents' custody rights to R.J.S., the orphans' court did not abuse its discretion by denying and dismissing Appellant's petition for adoption.

¶ 27 For all of the foregoing reasons, we hereby affirm the order of June 26, 2001, vacating the adoption decree, and affirm the order of November 17, 2004, denying and dismissing the petition for adoption.

¶ 28 Order affirmed.