J-A20038-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ELIZABETH ENCARNACION AND LUIS RAUL RIVERA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DIANNE VANESSA REYES-RIVERA, RAMON RIVERA AND BERKS COUNTY CHILDREN AND YOUTH SERVICES | : | No. 25 MDA 2023 |
| | : | |
| | : | |
| APPEAL OF: BERKS COUNTY CHILDREN AND YOUTH SERVICES AND ASHLEY ESPOSITO, ESQUIRE | : | |

Appeal from the Order Dated November 28, 2022
In the Court of Common Pleas of Berks County Civil Division at No(s):
18-16831

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: OCTOBER 16, 2023**

Berks County Children and Youth Services ("CYS" or "the Agency") and Ashley Esposito, Esquire (collectively, "Appellants"), appeal the November 28, 2022, order imposing sanctions for contempt and ordering CYS to mediate a custody or visitation schedule between Elizabeth Encarnacion ("Grandmother"), Luis Paul Rivera ("Grandfather") (collectively, "Grandparents") and three of Grandparents' grandchildren, L.R.R., born in January 2008, A.R.R., born in December 2008, and C.A.R.R., born in July 2013 (collectively, "the Children").  After a careful review, we reverse.

_____

[*] Former Justice specially assigned to the Superior Court.

Although this controversy is before us on the narrow issue of contempt stemming from a custody matter, the case also inextricably touches upon related dependency and adoption proceedings. The certified record reflects the following relevant facts and procedural history: CYS has been involved with this family in some capacity since 2007.[1] *See Encarnacion v. Berks County Children & Youth*, 284 A.3d 935 (Pa.Super. 2022) (unpublished memorandum). The Children were removed from their biological parents' custody in July 2017 due to allegations of domestic violence, inappropriate parenting, mental health issues, and substance abuse. *See* N.T., 9/6/19, at 9-10, 18-19. The Children were adjudicated dependent and placed with a foster family ("Adoptive Parents") beginning in December 2017.[2] *See Encarnacion*, *supra*, at 2-3.

In October 2018, Grandparents initiated the instant custody action, wherein they sought "physical and legal custody" of the Children or,

---

[1] The Agency's involvement did not begin with the Children but concerned three children that resided in a kinship placement with Grandparents between September 2007 and May 2011. *See* N.T., 9/6/19, at 26-27. During this time, the Agency detailed concerns about Grandfather using drugs and driving without a license, unpaid truancy fines, pest infestations, incidents of domestic violence, and allegations of criminal behavior involving weapons and narcotics. *See id*. at 27-30. Ultimately, the children were removed from Grandparents' custody in May 2011. *See id*. at 29-30. Thereafter, Grandparents unsuccessfully sought to be a foster resource in eight cases involving seventeen of their children or grandchildren. *See id*. at 31-38.

[2] The Children have remained exclusively in Adoptive Parents' care since that time, save for a period from August 2018 to June 2019, when they resided with a different, non-familial foster family. *See* N.T., 9/6/19, at 14-15.

alternatively, visitation rights. *See* Amended Complaint for Custody, 2/17/19, at ¶ 19; Pre-Trial Memorandum, 2/17/19, at 3. The custody case was assigned to the Honorable James M. Bucci, who ordered it be held in abeyance after noting the Children were subject to parallel dependency proceedings overseen by the Honorable Jeffrey K. Sprecher. *See* Order, 3/1/19.

In April 2019, Grandparents petitioned the dependency court for standing to participate in those proceedings. *See* N.T., 4/12/19, at 9-12. The Agency opposed the request and noted that Grandparents had twice applied to be foster parents to the Children, had been denied on both occasions, and had not appealed those findings.[3] *See id*. The dependency court did not grant Grandparents standing; however, the court directed that they be afforded a "third chance" to establish themselves as a suitable kinship placement for the Children. *Id*. at 16-17. At the same hearing, the Children's permanency goal was changed from reunification to adoption. *See id*. at 17-18. At Grandparents' request, the custody court reconsidered its earlier directive and scheduled a hearing on their custody petition for October 2019.

---

[3] On October 25, 2017, Grandparents were denied foster placement status for the first time due to being unable to supply state police and child abuse clearances. *See* N.T., 4/12/19, at 11-13; N.T., 9/6/19, at 31. Grandparents' second application was denied on January 4, 2018, after the Agency determined that they had failed to seek mandated mental health services. *See id*. Grandparents were required to appeal those determinations in writing within thirty days. *See* 55 Pa. Code § 3700.72 ("Foster family approval appeals.").

In August 2019, CYS referred Grandparents to an independent provider, Diakon, for their third fitness evaluation in these matters. Ultimately, Diakon declined to approve Grandparents as an adoptive home for the Children due to concerns about their lack of truthfulness during the evaluation. **See** Brief in Support of Petition to Vacate, 11/10/21, at Exhibit A. The record does not reflect that Grandparents appealed that determination in any fashion.

Instead, Grandparents renewed their request for "due process" rights in the dependency proceedings. **See** N.T., 9/6/19, at 15-17. The trial court devoted the entirety of a September 6, 2016, hearing to conducting extensive fact-finding concerning Grandparents' relationship with the Children and their history with the Agency. **See id**. at 8-116. Richard F. Small, Ph.D., a stipulated expert in psychology who had conducted foster fitness evaluations of Grandmother and Grandfather, opined that they both required mental health evaluations and treatment for domestic violence issues before the Children could be committed to their custody. **See id**. at 82, 91. Dr. Small also reported that Grandparents were evasive and contradictory during their evaluations. **See id**. at 85-86. Along similar lines, Joyce Riche of Diakon confirmed that Grandparents had been rejected as an adoptive resource due to their lack of candor during their third fitness evaluation. **See id**. at 96.

Ultimately, the dependency court adjourned the dependency proceedings and afforded Grandparents an opportunity to undergo mental health evaluations and domestic violence treatment. **See id**. at 106-16.

On October 31, 2019, Judge Bucci recused himself from the custody proceedings without having held a hearing.[4]  Thereafter, the matter was assigned to a second judge who took no action.  In February 2020, the custody case was reassigned to Judge Sprecher, who was now overseeing both the custody and dependency dockets.  *See* Order, 2/6/20.

No custody hearing was held within this time frame.  Between January and February 2020, the parental rights of the Children's biological parents were terminated.  *See Encarnacion*, *supra*, at 2-3.  Thereafter, the COVID-19 pandemic precluded the custody proceedings from progressing further. Between February 2020 and July 2020, the parties unsuccessfully attempted to negotiate an amicable resolution to Grandparents' custody claims.

In December 2020, the dependency court credited a psychological evaluation of the Children and ordered that their contact with their "birth family" be suspended due to concerns about "past trauma" negatively influencing the Children's behavior.  *See* Brief in Support of Petition to Vacate, 11/10/21, at Exhibit B. *See also* N.T., 2/10/21, at 7.  Thus, Grandparents' contact with the Children ceased in December 2020.

Ultimately, the custody court scheduled a hearing on Grandparents' complaint for February 10, 2021.  Prior to the hearing, Attorney Esposito was reassigned to represent the Agency in the custody proceedings following the

_____

[4]  The reason for Judge Bucci's recusal is not evident in the certified record.

sudden departure of one of her colleagues. On February 9, 2021, she applied for a continuance. At the hearing the next day, she explained that she needed additional time to review the extensive filings and records in the case since she had only recently taken over the matter. *See* N.T., 2/10/21, at 8-9. In seeking this continuance, Attorney Esposito also advised opposing counsel and the court: "[B]y way of full disclosure, the [a]gency is continuing to move forward with permanency for these children." *Id*. at 10. The court granted the request, and the hearing was rescheduled for March 4, 2021.

On February 16, 2021, however, the custody court was informed, for the first time, that adoption decrees with respect to the Children had been finalized by President Judge Thomas G. Parisi of the Berks County Court of Common Pleas on that same day. *See* N.T., 2/17/21, at 5; N.T., 8/31/21, at 6. Specifically, it came to light that Adoptive Parents had filed a petition to adopt the Children on February 3, 2021, through their private counsel, Susan Denaro, Esquire. Although Attorney Esposito did not participate in the adoption proceedings, she was aware of the pending adoption when she sought a continuance in the custody court. *See* N.T., 2/17/21, at 5-7.

The next day, Grandparents' counsel and Attorney Esposito appeared before the custody court to address the circumstances that had effectively

pre-empted Grandparents' custody complaint.[5] ***See id***. at 6. Specifically, the custody court expressed concern that Attorney Esposito had sought a continuance in an act of gamesmanship to ensure that Grandparents' custody case was not heard on the merits. ***Id***. at 5-7.

> Attorney Esposito explained her actions as follows:
>
> Respectfully, Your Honor, I did not ask for the continuance knowing that the adoption – I asked for the continuance because I genuinely needed time to actually understand and figure out what the case was. I didn't even know that it was anticipated that the date would be set for a full hearing with witnesses, and I was not prepared to proceed not knowing the history of the case.

***Id***. She also explained that the circumstances posed by these intersecting cases had placed her and the Agency in a "precarious" position since adoption proceedings are deemed to be "confidential" under Pennsylvania law. ***Id***. at 6-7. The custody court took no immediate action.

In March 2021, Grandparents filed a petition in the adoption proceedings seeking to intervene, requesting that the decrees be vacated, and asking that

---

[5] Pursuant to 23 Pa.C.S.A. § 5326, any "rights to seek physical custody or legal custody rights and any custody rights that have been granted…to a grandparent…prior to the adoption of the child by an individual other than a stepparent, grandparent or great-grandparent shall be automatically terminated upon such adoption." 23 Pa.C.S.A. § 5326. As this Court has observed, "a decree of adoption terminates forever all relations between a child and his biological parents and severs the child entirely from its own family tree and engrafts it upon its new parentage." ***E.T.S. v. S.L.H.***, 54 A.3d 880, 883 (Pa.Super. 2012) (concluding that any rights arguably based upon an assertion of *in loco parentis* "prior to the adoption of the [c]hildren was terminated at the time of their adoption") (citing 23 Pa.C.S.A. § 5326). ***See Faust v. Messinger***, 497 A.2d 1351, 1353-54 (Pa.Super. 1985) (same).

the adoption be transferred to Judge Sprecher. *See* N.T., 8/31/21, at 28-32. Following an unrecorded conference that took place in President Judge Parisi's chambers on April 6, 2021, Grandparents voluntarily withdrew the intervention petition without further proceedings. *Id*.

On May 26, 2021, Grandparents submitted a petition for special relief in the custody court seeking, *inter alia*, to hold Appellants and Attorney Denaro in contempt of court. On August 31, 2021, the custody court held a hearing on the petition, wherein Attorney Denaro testified extensively regarding the events that took place in the adoption proceedings.

Attorney Denaro reported that President Judge Parisi had been made fully aware of Grandparents' pending custody matter, and he had declined to order that notice of the adoption proceedings be provided to Grandparents.[6] *See id*. at 5-39. In opposing Grandparents' allegations, Appellants reiterated that they had been effectively precluded from alerting the custody court regarding the adoption proceedings by the provisions of 23 Pa.C.S.A. § 2910, which criminalizes disclosure of "confidential information relating to an

---

[6] We note that 23 Pa.C.S.A. § 2721 only requires that notice of an adoption hearing be provided to "all persons whose consents are required and to such other persons as the court shall direct." 23 Pa.C.S.A. § 2721. Grandparents are not identified as parties whose consent is necessary to adopt. *See* 23 Pa.C.S.A. § 2711(a)(1)-(5). Furthermore, this Court has opined that "[t]he limited, transitory nature of grandparental visitation privileges…convinces us that the privileges may be terminated in an adoption, just as all familial ties between an adoptee and other blood relatives are severed, **without notice and without hearing.**" *Faust*, 497 A.2d at 1353 (emphasis added).

adoption" by "[a]ny officer or employee of the court, other than a judge[.]"

23 Pa.C.S.A. § 2910.

> On October 18, 2021, the trial court filed an order providing as follows:
>
> AND NOW, this 15th day of October, 2021, in accordance with the attached [o]pinion setting forth the procedural and substantive defects in the above captioned custody case and the related adoptions, it is hereby ORDERED that all parties, counsel, and the adoptive parents shall appear in Courtroom 9 on November 19, 2021, at 11:30 A.M. to work on an agreed visitation schedule between [Grandparents] and the [Children].
>
> If the parties enter into an agreement prior to the hearing date, the parties shall submit the agreement and proposed order, and this court will cancel the hearing.  This court's goal is to allow contact as can be arranged by the adopting parents and [G]randparents.
>
> Failing the above, this court will move forward with sanctions and a full custody hearing in the custody action, as previously scheduled on February 10, 2021, which hearing was circumvented by [the Agency] and counsel for [Adoptive Parents].

Order, 10/18/21.  Appellants filed a petition to vacate the purported findings of contempt, which was granted with respect to Attorney Denaro but denied as to Appellants.  *See* Order, 1/19/22.

Appellants filed an appeal from the January 19, 2022, order denying their petition to vacate, which was quashed by this Court after we determined that the order was not final and appealable since future proceedings were still contemplated, *i.e.*, a hearing concerning the imposition of sanctions.  *See* ***Encarnacion***, ***supra***, at 3-4.  On remand, the custody court held a hearing on sanctions, wherein the parties largely reiterated their earlier arguments concerning contempt and confidentiality.  *See* N.T., 11/10/22, at 2-25.

On November 28, 2022, the trial court filed the following order:

AND NOW, this 23rd day of November, 2022, after argument of counsel and review of the record, it is hereby ORDERED as follows regarding the sanctions of [Appellants]:

1. This court has jurisdiction of the parties in this case due to the court's finding of contempt. Courts retain jurisdiction to enforce orders.

2. At the time of the original custody trial, [the Agency] had legal custody of the [C]hildren and the ability to enter into custody agreements, which prior counsel for [the Agency] had agreed to do. [The Agency] did not execute any agreement and gave no reason why a custody agreement was not forthcoming. [The Agency] shall mediate a custody/visitation schedule of the subject children between plaintiffs and adoptive parents within 30 days of the date of this order.

3. In the event that no mediation order is entered by January 2, 2023, this court will be entering an order for custody/visitation upon *praecipe* of plaintiff's counsel. The parties shall each submit a proposed order of visitation of this court no later than January 13, 2023.

4. [The Agency] shall pay plaintiffs' attorney fees as stated in court by [Grandparents' counsel] in the amount of $7,500.00 within 45 days of the date of this [o]rder.

5. Attorney Esposito shall pay a sanction in the amount of $250 payable to the County of Berks and delivered and filed in the Berks County Prothonotary Office within 45 days of the date of this order.

Order, 11/28/22, at 1-2.

On December 22, 2022, Appellants filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to

Pa.R.A.P. 1925(a)(2)(i) and (b).[7] The custody court filed a responsive opinion explaining the court's reasoning pursuant to Rule 1925(a)(2)(ii).

Appellants have raised the following issues for our consideration:

1. Whether the trial court erred in finding that the evidence warranted a finding of civil contempt against [Appellants] where [Grandparents] failed to present sufficient evidence that there was contemptuous conduct?

2. Whether the trial court erred when it issued monetary sanctions against [Attorney Esposito] where [Grandparents] failed to present any evidence of monetary damages and where the amount ordered was inappropriate and unnecessarily burdensome?

3. Whether the trial court erred when it ordered [the Agency] to pay [Grandparents'] counsel fees where [Grandparents] failed to present invoices, bills, or other evidence of attorneys' fees?

4. Whether the trial court erred in ordering [the Agency] to mediate a custody/visitation schedule where the trial court had no jurisdiction over the subject children given that they had already been adopted?

Appellants' Brief at 4-5.

_____

[7] Given this Court's earlier disposition in ***Encarnacion v. Berks County Children & Youth***, 284 A.3d 935 (Pa.Super. 2022) (unpublished memorandum), we note that the trial court's November 28, 2022, order imposing sanctions in connection with its earlier finding of contempt was final for the purposes of appealability. ***See Glynn v. Glynn***, 789 A.2d 242, 248 (Pa.Super. 2001) ("[F]or a contempt order to be properly appealable, it is only necessary that the order impose sanctions on the contemnor and that no further court order be required before the sanctions take effect."); Pa.R.A.P. 341(a). Instantly, the financial sanctions imposed upon Appellants took immediate effect, thereby rendering the order final and appealable. Furthermore, the mere fact that the order also contained a purge condition does not impact its finality in this context. ***See Glynn***, 789 A.2d at 248 ("[T]he purge conditions did not render the [o]rder interlocutory.").

Our standard of review regarding a trial court's finding of contempt is "very narrow" and "limited to a determination of whether the trial court abused its discretion." **Gross v. Mintz**, 284 A.3d 479, 489 (Pa.Super. 2022). In this context, an abuse of discretion occurs where the trial court, "in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill will as shown by the evidence of record." **Id**.

Preliminarily, we note that the custody court did not explicitly identify the nature of its contempt finding. Under Pennsylvania law, "[c]ontempt proceedings may be criminal or civil in nature." **County of Fulton v. Secretary of Commonwealth**, ___ Pa. ___, 292 A.3d 974, 1027 (2023). This distinction is not merely formalistic, but it is "extremely important" since it determines both "the due process rights of the alleged contemnor" and the relevant burdens of proof. **Id**. (cleaned up). There is no "bright line distinction" drawn between the two basic varieties of contempt, since civil and criminal contempt each share "common attributes." **Id**. However, "the decisions of our Supreme Court agree that the fundamental and controlling difference between civil and criminal contempt proceedings is the '**dominant purpose**' of the sanctions that are to be imposed." **Id**. (emphasis in original).

This determination "depends on whether the core purpose of the sanction imposed is to vindicate the authority of the court, in which case the contempt is criminal, or whether the contempt is to aid the beneficiary of the

order being defied, in which case it is civil." *Id*. at 1028. *See Knaus v. Knaus*, 387 Pa. 370, 127 A.2d 669, 672 (1956) ("[W]here the act of contempt complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature."). Additionally, our Supreme Court has enumerated five additional factors that, if present, suggest that a contempt proceeding is civil rather than criminal:

> (1) Where the complainant is a private person as opposed to the government or a governmental agency; (2) where the proceeding is entitled in the original injunction action and filed as a continuation thereof as opposed to a separate and independent action; (3) where holding the defendant in contempt affords relief to a private party; (4) where the relief requested is primarily for the benefit of the complainant; and (5) where the acts of contempt complained of are primarily civil in character and do not of themselves constitute crimes or conduct by the defendant so contumelious that the court is impelled to act on its own motion.

*County of Fulton*, *supra*, at 1028 (citation and quotation marks omitted).

Upon review, we readily conclude that the "dominant purpose" of the custody court's final contempt order of November 28, 2022, was to benefit Grandparents by coercing Appellants into securing Grandparents legal custody or visitation rights with respect to the Children. Accordingly, the basic thrust of the contempt in the instant matter is civil in nature. *See County of Fulton*, *supra*, at 1027-28. Furthermore, Grandparents are private litigants who petitioned for a contempt finding in the instant case as a means of securing relief, *i.e.*, custody rights as to the Children. *See id*. at 1028. Finally, there is no allegation or suggestion that the actions of Appellants were criminal, in

and of themselves.  Accordingly, we hold that the instant case concerns civil contempt.

> In order to sustain a finding of civil contempt,
>
> > the complainant must prove certain distinct elements by a preponderance of the evidence: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent.  Moreover, a court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment.  A party must have violated a court order to be found in civil contempt.

**Gross**, 284 A.3d at 489.  In this context, "the general rule is that in civil contempt proceedings the burden is on the complaining party to prove noncompliance by a preponderance of the evidence, but that present inability to comply is an affirmative defense which must be proved by the alleged contemnor."  **Barrett v. Barrett**, 470 Pa. 253, 368 A.2d 616, 621 (1977).

Appellant's first claim for relief asserts that the custody court's finding of civil contempt was not supported by sufficient evidence.  **See** Appellants' Brief at 17 ("Despite this lack of evidence, the trial court opined that Attorney Esposito committed fraud upon the court by omission when she failed to inform the [custody] court, at the time she requested a continuance in the custody matter, that the adoption hearing was scheduled a week later.").  Unfortunately, the custody court's Rule 1925(a) opinion is not responsive to the issue of civil contempt.  Instead, it discusses topics such as fraud and culpability with the obvious object of convincing this Court to vacate the

adoption decrees entered with respect to the Children. **See** Custody Court Opinion, 2/27/23, at 26 ("To assure there is real access to the legal system, the administration of justice, and confidence in the rule of law and the justice system in our democracy, I am forced to ask for the only relief that still remains, that the adoption hearing be vacated.").

The custody court argues that such extraordinary relief is mandated due to "the [a]gency's intractable position that it does not have to facilitate any visitation between the [C]hildren and Grandparents." **Id**. at 11. Overall, the custody court seems to believe that these custody proceedings should have taken priority over the adoption proceedings. **Id**. at 22 ("If the adoption hearing was stayed, I could have made the right decision with this information and...avoided destroying Grandparents' case by pulling the carpet out from under them without any reason to do so. That would have been the right thing."). In support, the trial court has invoked **In re Adoption of R.J.S.**, 889 A.2d 92 (Pa.Super. 2005), wherein this Court affirmed a trial court's *vacatur* of an adoption decree based upon flagrant misrepresentations that occurred during the underlying adoption proceedings.

In **R.J.S.**, a maternal aunt and uncle had primary physical custody of a child, while the child's paternal grandparents had partial physical custody, pursuant to an order entered following a "comprehensive custody evaluation" and hearing. **See id**. at 93-94. Without providing notice to the grandparents, the aunt and uncle filed a petition to adopt the child. During the ensuing

proceedings, the maternal aunt and uncle made key omissions in their representations to the adoption court, which resulted in the court never learning of the paternal grandparents' ongoing custody rights or relationship with the child. *Id*. at 94-95. Although an adoption decree was entered, the adoption court vacated it after concluding that the paternal grandparents "had been entitled to notice of the adoption proceedings[.]" *Id*. at 95.

On appeal, this Court affirmed the *vacatur* of the adoption decree after finding that the misrepresentations during the adoption proceedings had effectively deprived the adoption court of an opportunity to determine what parties were entitled to notice pursuant to 23 Pa.C.S.A. § 2721. *R.J.S.*, 889 A.2d at 97. Furthermore, this Court held the failure to ensure that paternal grandparents had an opportunity to participate in the adoption proceedings had implications with respect to the "best interests" of the child, which undermined confidence in the validity of the adoption determination. *Id*. at 98.

Concomitantly, we also must acknowledge that Pennsylvania precedent provides that, in the context of adoption, "'a child's interests are best served when all those who demonstrate an interest in the child's welfare are allowed to be heard.'" *In re Adoption of J.E.F.*, 864 A.2d 1207, 1211 (Pa.Super. 2004) (quoting *In re Adoption of Hess*, 530 Pa. 218, 608 A.2d 10, 15 (1992)). To that end, this Court has vacated adoption decrees where parties

with custody interests are denied an opportunity to participate in the proceedings. *See R.J.S.*, *supra*, at 98-99; *J.E.F.*, *supra*, at 1211.

There is a critical distinction, however, between these cases and the instant controversy – any arguable question concerning the validity of the adoption decrees pertaining to the Children are not presently before this Court for adjudication.[8] Rather, this appeal lies exclusively from the custody court's November 28, 2022, order, which imposed immediate sanctions upon Appellants in connection with civil contempt. As recited above, neither of the contempt-related orders entered in this case contained any directive that purported to alter the validity or legal effect of the adoption decrees.

Indeed, the custody court acknowledged as much during the November 10, 2022, sanctions hearing, as follows:

> THE COURT: [T]his is a contempt proceeding. I've tried to – I tried to make this that I could adjust proceeding where the right thing would be done to give someone the opportunity to give [Grandparents] visitation, to allow that to happen, and we could avoid contempt.
>
> [GRANDPARENTS' COUNSEL]: Right.
>
> THE COURT: That didn't happen. So, it's simply a contempt petition, a contempt proceeding….

---

[8] As discussed in the factual summary *supra*, Grandparents filed a petition in the adoption court seeking to intervene, vacate the adoption decrees, and transfer the adoption proceedings to the custody court. *See* N.T., 8/31/21, at 28-32. This motion, presumably, provided a potential avenue for the relief suggested by the custody court. However, Grandparents voluntarily withdrew it. *See id*.

- 17 -

N.T., 11/10/22, at 22-23.

There is simply no dispute that the order in question in this appeal does not touch upon the Children's adoption decrees. To the extent the custody court is now inviting this Court to reach beyond the scope of the order appealed from by Appellants and *sua sponte* vacate the Children's respective adoption decrees, we must decline to do so as a matter of justiciability.[9] Limiting our review, as we must, to the narrow question of civil contempt, we will assess solely whether Grandparents adequately established the necessary elements of civil contempt as to Appellants. **See Gross**, **supra**, at 489.

In discussing civil contempt, this Court has emphasized:

A court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment. A party must have violated a court order to be found in civil contempt. The

---

[9] Another crucial distinction between the cases cited above and the instant matter is that there are no indications that the adoption court was misled concerning the Grandparents' status or existence. To the contrary, Attorney Denaro presented a summary of the procedural history concerning Grandparents' involvement with the Children, which accurately apprised the adoption court that: (1) Grandparents had repeatedly sought to serve as a kinship placement for the Children and had been denied; (2) Grandparents' visitations with the Children had been suspended in December 2020 based upon a therapeutic recommendation that was credited by Judge Sprecher; (3) Grandparents had initiated a custody action that was pending at the time of the adoption proceedings; and (4) although Grandparents were generally aware that the Agency was moving forward with the Children's permanency goal, *i.e.*, adoption, they had not been explicitly notified of the adoption proceedings instituted by Adoptive Parents. **See** CYS Exhibit 3 at 2; N.T., 8/31/21, at 5-39. Thereafter, the adoption court declined to direct that notice be provided to Grandparents as contemplated by Section 2721. Thus, there is no indication that the adoption court was unaware of the relevant circumstances.

complaining party has the burden of proving by a preponderance of evidence that a party violated a court order[.]

***Garr v. Peters***, 773 A.2d 183, 189 (Pa.Super. 2001). ***See Marian Shop, Inc. v. Baird***, 670 A.2d 671, 673 (Pa.Super. 1996) ("In order to support a finding of contempt, the order or decree which the contemnor has been held to have violated must be **definite, clear, and specific** – leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct." (emphasis in original)).

As recited above, the two purported contempt orders issued in this case were filed on October 18, 2021, and November 28, 2022, respectively. We note that there is no allegation that Appellants were in violation of an existing court order in October 2021, as required for a finding of civil contempt under Pennsylvania law. ***See Garr***, ***supra***, at 189. In the absence of a colorable violation of a court order, a finding of civil contempt would not be possible. ***See id***.; ***Baird***, ***supra***, at 673. Rather than a finding of contempt, we view the custody court's October 18, 2021, order as merely setting the stage for future proceedings by ordering Appellants to negotiate and institute an "agreed visitation schedule" that would award Grandparents some manner of rights to the Children. ***See*** Order, 10/18/21, at 1. ***See also Encarnacion***, ***supra***, at 3. Under this order, sanctions for contempt would only be considered if the parties failed to execute such an agreement.

As detailed above, Appellants did not comply with this directive, and the custody court made a finding of contempt and imposed monetary sanctions in

the November 28, 2022, order. *See* Order, 11/28/22, at 1-2. From the language in the order, it is clear that the custody court predicated its contempt findings upon Appellants' failure to comply with the October 18, 2021, order. *See id*. at 1-2 (noting that these proceedings sounded in contempt and Appellants had failed to negotiate a custody agreement with Grandparents as ordered by the custody court).

However, it is well-established that "[t]o impose civil contempt the trial court must be convinced beyond a reasonable doubt from the totality of evidence presented that the contemnor has the present ability to comply with the order" they are alleged to have violated. *Garr*, *supra*, at 189. Instantly, it is beyond cavil that the Children implicated in these custody proceedings had already been adopted when the custody court ordered Appellants to negotiate a custody or visitation schedule with respect to Grandparents. As a consequence of the Children's adoption, Grandparents could no longer seek any custody rights as to the Children as a matter of Pennsylvania law. *See* 23 Pa.C.S.A. § 5326 (providing that "[a]ny rights to seek physical custody or legal custody rights" are "automatically terminated" upon adoption). As this Court has explained, "[a] decree of adoption…severs the child entirely from its own family tree and engrafts it upon its new parentage." *R.J.S.*, *supra*, at 100 n.7. We also emphasize that a decree of adoption "terminates the natural grandparents' visitation rights[.]" *Id*.

Thus, at the time Appellants were ordered to begin negotiations, Grandparents had no legal basis under which they could be awarded custody or visitation. Furthermore, following the adoption decree, the Agency no longer had legal custody of the Children and possessed no ability to directly control or impact custody of the Children in a meaningful way.

We discern that the only avenue by which Grandparents could arguably obtain legal visitation with the Children is by the execution of a post-adoption contact agreement ("PACA"), which provides "an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact[.]" 23 Pa.C.S.A. § 2731. However, it is a matter of record that Adoptive Parents are unwilling to enter into such an agreement with Grandparents. *See* N.T., 8/31/21, at 11 (Attorney Denaro reporting that her clients, Adoptive Parents, refuse to consent to the execution of a PACA). Given Adoptive Parents' refusal to consent, any PACA that was prospectively negotiated between Appellants and Grandparents in service to the custody court's October 18, 2021, order would not be approvable. *See* 23 Pa.C.S.A. § 2735(b)(1) (mandating that a PACA be "entered into knowingly and voluntarily by all parties" as a prerequisite to its court approval). *See also, e.g.*, *Faust v. Messinger*, 497 A.2d 1351, 1353-54 (Pa.Super. 1985) ("[A]doptive or natural parents should have the right to select the persons with whom their child will associate as long as they properly perform their

duties to the child. To take this right away from proper parents would not be for the best interests of the child.").

Based upon the foregoing, we find that the custody court abused its discretion and legally erred by finding Appellants in civil contempt for violating an order that was not capable of fulfillment. As discussed above, the record is clear that Grandparents had no legal standing to seek custody in their own right, and Adoptive Parents were not willing to gratuitously grant them any analogous rights. *See* 23 Pa.C.S.A. § 5326; N.T., 8/31/21, at 11. Appellants were effectively ordered to undertake what amounted to a fool's errand – to secure visitation rights for Grandparents in the absence of any legal mechanism with which to do so.

Instantly, the custody court's findings of civil contempt and imposition of sanctions were predicated upon Appellants' purported failure to comply with this impossible provision of its order. *See* Order, 11/28/22, at 1-2. Accordingly, we reverse the findings of contempt and the sanctions imposed upon Appellants. *See*, *e.g.*, *Sinaiko v. Sinaiko*, 664 A.3d 1005, 1009-10 (Pa.Super. 1995) ("[A] showing of non-compliance is not sufficient in itself to prove contempt….A court cannot impose a coercive sentence conditioned on the contemnor's performance of an act which is incapable of performance." (citations and quotation marks omitted)).

Based upon our resolution of Appellants' first claim for relief, we need not address the remainder of their issues.[10]

Order reversed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2023

---

[10] The custody court's November 28, 2022, order contemplates further proceedings and essentially promises to enter an order in Grandparents' favor. *See* Order, 11/28/22, at ¶ 3 ("In the event that no mediation order is entered by January 2, 2023, this court will be entering an order for custody/visitation upon *praecipe* of plaintiff's counsel."). We express no opinion on the potential validity of such an order, as it is not presently before us for consideration. However, we caution the custody court that "[i]t is settled that an adjudication of contempt is not a proper basis to modify an existing custody arrangement." *J.M. v. K.W.*, 164 A.3d 1260, 1267 (Pa.Super. 2017). Furthermore, an award of custody rights is not one of the enumerated sanctions permitted in the context of contempt proceedings. *Cf.* 23 Pa.C.S.A. § 5323(g)(1)(i)-(v).